IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

The ESTATE of TYLER J. MEIER, by
Personal Representative Travis J. Meier,

> Plaintiff,

v.

EAU CLAIRE COUNTY, CITY OF AUGUSTA,                    OPINION and ORDER
GORDON O'BRIEN, in his official capacity as
Chief of Police for the City of Augusta,                    22-cv-102-jdp
LEVI M. STUMO, individually and as a police
officer for the City of Augusta, RON D. CRAMER,
in his official capacity as Eau Claire County Sheriff,
and
DANIEL T. EATON, individually and as a deputy
sheriff for Eau Claire County,

> Defendants.

---

On a cold day in March 2019, Tyler Meier showed up naked at a stranger's farm in Augusta, Wisconsin. The owner called the police, and two officers responded: defendant Daniel Eaton from the Eau Claire County sheriff's department and defendant Levi Stumo from the Augusta police department. When the officers arrived, it was clear that something was wrong with Meier. He had run his car into a snowbank, he was making bizarre comments about religion, and his movements were erratic. He declined the officers' requests for assistance.

The officers did not arrest Meier. Instead, they followed him for more than a half hour as he walked down a snowy road without any apparent destination. During this time, the officers received information from dispatch that Meier had a violent past, including that he may have killed someone in a bar fight. Meier continued acting very strangely, including by getting down on his knees, pushing his own face into the snow, and telling the officers they

"may as well shoot" him. When Meier threatened to jump into freezing water because it "looked refreshing" and he wanted to be "baptized" before he died, the officers took out their tasers. Meier ran toward Stumo, which started a physical confrontation between Meier and the officers, during which Meier attacked both officers multiple times. Eaton first deployed a taser on Meier and then OC spray. Neither subdued Meier. When Meier charged at Stumo with arms outstretched toward Stumo's neck, Stumo shot Meier in the chest, killing him.

Meier's estate is suing the officers, the municipalities they represent, and the municipality's leaders. The estate contends that the officers violated Meier's Fourth Amendment rights by detaining him, using a taser on him, and shooting him. The estate also contends that county and city policies for dealing with mental health issues are inadequate and that defendants violated federal disability law. Both the county and city defendants moved for summary judgment on all claims. Dkt. 34 and Dkt. 43.

What happened to Meier is tragic. Even today, it still isn't clear what prompted him to exhibit such bizarre behavior in March 2019. He was not intoxicated or under the influence of drugs. He suffered from depression and anxiety, but he had never acted similarly in the past. Regardless of the reason for Meier's behavior, to prevail on its claims, the estate must show that defendants violated Meier's clearly established rights. The estate hasn't done that. There may have been things that the officers could have done differently to avoid the sad outcome of this case: given Meier more space, refrained from drawing their tasers, or simply left him alone. It may also be debated whether there were alternatives to Stumo shooting Meier, who was naked and unarmed.

But the question under the Fourth Amendment isn't whether the harm to Meier could have been avoided. It is whether the officers' conduct was reasonable at the time, without the

benefit of hindsight. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The officers have offered reasonable justifications for each of their actions that the estate challenges. "Even if the officers misconstrued [Meier's] actions or misjudged the amount of force needed to subdue him, qualified immunity protects officers from mistakes in judgment of this sort." *Dockery v. Blackburn*, 911 F.3d 458, 468–69 (7th Cir. 2018).

The estate has failed to cite any authority that the officers violated Meier's clearly established rights, so the court must grant summary judgment to defendants on the Fourth Amendment claims. As for the estate's claims regarding municipal liability and the federal disability statutes, the estate has not adduced evidence that municipal policies or any failure to accommodate a mental disability is what caused Meier's injuries. The court will grant summary judgment to defendants on those claims as well.

## UNDISPUTED FACTS

The following facts are undisputed.

On March 1, 2019, Tyler Meier visited his son, Travis Meier. (The court will refer to Tyler Meier as "Meier" and Travis Meier as "Travis."). Meier appeared with a Bible and was "talking strangely." Dkt. 79, ¶ 63. Later in the day, Meier went to a local business, where he began speaking to an employee "about religion and the Bible." Dkt. 63, ¶ 7. The employee called the City of Eau Claire Police Department. Police responded to the call but did not arrest or detain Meier.

Meier spent the night at his son's home. At 4:00 a.m. on March 2, Travis found Meier burning his possessions, including his ID. Meier said, "The dogs are coming."

Meier had been diagnosed with anxiety disorder, and he suffered from depression, but Travis had never seen Meier act like this before. Travis wanted to call an ambulance, but Meier talked him out of it. At 8:00 a.m., Meier apologized to Travis and left, telling Travis that he was going to talk to his chiropractor, who had given him advice in the past.

At around 11 a.m., defendant Daniel Eaton, a deputy sheriff for Eau Claire County, responded to a request from dispatch regarding an unidentified man who appeared on a rural farm in Augusta, Wisconsin. The dispatcher relayed information provided by the owner of the farm, who had called 911. Specifically, the dispatcher said that the man arrived in a black car and approached the farmhouse on foot. The man was "acting very strange" and had taken off all his clothes.

At the time of the call, it was 19 degrees Fahrenheit. The man was Tyler Meier, but the dispatcher didn't know his name or that he had contact with the City of Eau Claire Police Department the previous day.

Eaton asked the dispatcher for backup from the Augusta Police Department, stating, "Get somebody out here quick." Defendant Levi Stumo, an Augusta police officer, responded to the call. The dispatcher informed Stumo that the man was "acting crazy" and did not have any clothes on.

Eaton and Stumo met approximately 200 to 300 yards from the farm. Using binoculars, Eaton observed a black car and a man—who was now clothed—by the mailbox. The car had been driven into a snowbank on the side of the road. Neither Eaton nor Stumo recognized the man and had no prior contacts with him.

At Eaton's request, the dispatcher ran a check on the license plate of the car. The dispatcher told Eaton that the car was owned by Trystan Meier, who was "subject to a 10-0,"

4

meaning that he had a history of violence with law enforcement.[1] The dispatcher also "did a run on Tyler Meier." (The parties don't cite evidence regarding why the dispatcher researched Tyler Meier, but defendants say it was because records identified him as a driver of the car.) The dispatcher reported that Tyler Meier was on probation and had a "flag for combative." Dkt. 37-1 (Trans. 5:25–6:15).

Eaton and Stumo parked their squad cars approximately 20 to 25 feet away from Meier. As the officers approached Meier on foot, he began walking down the snow-covered road in the opposite direction. When the officers reached Meier, they spoke to him in a "calm and non-authoritative tone." Dkt. 85, ¶ 31. They introduced themselves using their first names, asked Meier for his name, and told him they were there to help him. It isn't clear whether Meier gave his name, but it appears to be undisputed that the officers learned that he was Tyler Meier at some point.

The officers asked Meier if he would like to sit in their car to get warm. Meier continued walking.

Eaton followed Meier on foot while Stumo followed in his squad car. Stumo was about 25 feet behind Meier. Eaton says that he stayed between 5 and 15 feet behind Meier; Stumo says that Eaton was "less than five" feet behind Meier. Dkt. 39 (Stumo Dep. at 72:21–73:3). Eaton says that he stayed close to Meier because he didn't want to shout to talk to Meier, which he believed could escalate the situation.

---

[1] The parties don't explain how Trystan Meier was related to Tyler Meier.

Eaton and Stumo followed Meier down the road for more than a half hour. The parties did not lay out a clear chronology of events during that time, but they agree that the following events occurred:

- Meier made statements about the Bible and about "committing unforgivable sins."

- The volume of Meier's voice fluctuated, and he waved his arms up and down.

- Several times, Eaton directed Meier to take his hands out of his pockets and Meier complied.

- Eaton contacted dispatch and requested back up. He also said to the dispatcher, "This is probably going to be a fight." Meier told Eaton, "You're going to do what you're going to do. You're going to hell."

- Eaton received the following update from dispatch:

  More information for units responding to Kempton. I believe the individual is a gold glove boxer and has spent time in prison for (indiscernible) somebody in a bar fight.... 415 indicated that (indiscernible) a gold club boxer, probably spent time in prison. Reference a death in a bar fight.

Eaton and Stumo interpreted "reference a death in a bar fight" to mean that Meier had killed someone in a bar fight. Neither side cites evidence regarding whether that is accurate.

- Meier stopped walking, lowered himself to his knees, and drew various symbols in the snow. He began moving on his knees, at one point stopping to push his face into the snow. He stated several times that he had sinned against God and would have to pay for his sins.

- Meier told the officers, "You may as well shoot me." In response, Eaton told Meier that they were there to help him, not hurt him.

6

- Stumo contacted dispatch. He said that the suspect was making comments "about us wanting to shoot him." He asked the backup officers to "step that up," meaning get to the scene as quickly as possible.

The chronology becomes clearer after Meier walked to a bridge over a creek, which was about a quarter of a mile from where the officers first encountered Meier. He said, "I've never been baptized before" and he wanted to be baptized before he died. He began removing his clothing, stating that the water looked refreshing.

Eaton "may have" removed his taser from his holster in the event that he needed to use it to prevent Meier from jumping in the water. Dkt. 79, ¶ 26. Stumo got out of his squad car, which was approximately 50 feet away from Meier. Eaton directed Stumo to draw his taser. Stumo complied, pointing it at the ground. Eaton and Stumo ordered Meier to keep his clothing on. Meier continued removing his clothing until he was naked.

Meier began running toward Stumo. Stumo attempted to deploy his taser, but the safety was still on. Eaton deployed his taser, hitting Meier.

Meier fell at Stumo's feet. Meier grabbed Stumo's legs and tried to use his body to climb up on top of him. Stumo tried to push Meier off him and yelled at Meier to get off him. Meier was at least 6 feet tall and 250 pounds; Stumo was approximately 5 feet, 4 inches and 120 pounds.

Meier got "fully on top" of Stumo and began trying to bite Stumo's right arm and choke him. Stumo continued yelling at Meier to get off while trying to push him away. Eaton observed that Meier was in a "front mount position." Dkt. 85, ¶ 54.

Eaton rushed over to Stumo and Meier and used OC spray on Meier. That did not stop Meier, so Eaton pulled Meier off and away from Stumo, which required a "great amount of force." Dkt. 85, ¶ 55. Eaton ended up falling onto his back.

Meier tried to "gain a front mount" on Eaton. Dkt. 85, ¶ 59. Eaton drew his firearm and kicked Meier off him.

Meier turned toward Stumo. With his arms outstretched, Meier charged at Stumo. As Meier's hands made contact with Stumo's neck, Stumo drew his firearm and shot Meier in the torso. Meier fell to the ground, and he later died from the gunshot.

ANALYSIS

The estate is asserting the following claims: (1) Eaton and Stumo detained Meier, in violation of the Fourth Amendment; (2) Eaton used excessive force by deploying his taser, in violation of the Fourth Amendment; (3) Stumo used excessive force by shooting Meier, in violation of the Fourth Amendment; (4) the county and city have unconstitutional policies; and (5) the county and the city discriminated against Meier because of a mental disability, in violation of the American with Disabilities Act and the Rehabilitation Act.

Defendants move for summary judgment on each of those claims. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## A.  Detention

The estate's first claim is that Eaton and Stumo unreasonably seized Meier at some point after they began to follow him down the road but before Eaton used his taser on Meier. Much of the estate's briefs is devoted to this claim, but the estate doesn't explain the importance of the claim or what harm Meier suffered before the use of the taser. Presumably the estate's theory is that the use of the taser could have been avoided if defendants had not previously seized Meier and that Meier suffered emotional distress because of that previous seizure.

Defendants seek summary judgment on this claim on multiple grounds: (1) defendants did not seize Meier within the meaning of the Fourth Amendment; (2) any seizure was justified under the "community caretaker" doctrine; (3) any seizure was justified by both reasonable suspicion and probable cause that Meier had committed a crime; and (4) the law was not clearly established that defendants' conduct qualified as a seizure or that it violated the Fourth Amendment. Each of these contentions has merit, but the fourth one is dispositive. The estate hasn't shown that the law was clearly established that defendants seized Meier or that their conduct violated the Fourth Amendment, so Eaton and Stumo are entitled to summary judgment on this claim.

Under the doctrine of qualified immunity, a plaintiff may not obtain damages from a defendant for a constitutional violation unless the plaintiff shows not only that the defendant violated his rights, but also that his rights were clearly established at the relevant time. The plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir.

2021). In deciding whether the defendants are entitled to qualified immunity on a motion for summary judgment, the court must view the evidence in the light most favorable to the plaintiff and ask whether a reasonable jury could find that the defendants violated the plaintiff's clearly established rights. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

### 1.  Whether defendants seized Meier before deploying the taser

A person is seized by the police under the Fourth Amendment when the officer terminates or restrains the person's freedom of movement by means of intentional physical force or show of authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007). This occurs when a reasonable person would not feel free to leave or otherwise disregard the officers. *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015). This "is a highly fact-bound inquiry." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008).

In evaluating whether a person was seized, courts look at factors such as the number of officers, the display of weapons, physical touching, use of forceful language, tone of voice, police statements suggesting that the person is a suspect, efforts by the police to restrict the person's movement, how private the location of the encounter is, and whether the officers failed to inform the person that he was free to leave. *Smith*, 794 F.3d at 684. More generally, courts look at whether there was "coercive conduct on the part of the police that indicates cooperation is required." *Tyler*, 512 F.3d at 410.

In this case, a threshold question is at what point in time the alleged seizure occurred. In answering this question, the estate focuses on *Meier*'s conduct. The estate acknowledges that a seizure does not occur until the person submits to the authority of the police. *See Brendlin*, 551 U.S. at 254. And the estate says that Meier submitted to defendants either when he pushed

10

his face into the snow or when he stopped walking at the bridge. Little time passed between Meier arriving at the bridge and Eaton's use of the taser, and the estate does not point to any harm suffered in the interim. And it isn't clear that Meier was "submitting" to anything at either point in time. He continued walking away from defendants after pushing his face in the snow, and he ran toward Stumo shortly after he stopped at the bridge.

Regardless of whether any of Meier's conduct could be reasonably construed as submission, the estate must still point to conduct by Eaton and Stumo that would lead a reasonable person to believe that he was not free to leave. At least some of the factors identified in *Smith* support a contrary conclusion. It is well established that police officers do not seize a person simply by approaching him and asking questions. *Smith*, 794 F.3d at 684. Defendants never touched Meier, threatened him, raised their voices at him, or told him where he could or couldn't go. They never told him to do anything, other than keep his hands out of his pockets.

In arguing that defendants seized Meier, the estate points to the following facts: (1) both defendants followed Meier closely for more than a half hour; (2) Meier's movement was restricted by defendants, their vehicles, and the snow; (3) defendants told Meier to remove his hands from his pockets multiple times; and (4) the surrounding area was isolated. Some of these facts provide little support for plaintiffs' claim. For example, case law is clear that officers don't violate the Fourth Amendment by giving minimally intrusive directions for the purpose of protecting the officers. *See Hamilton v. Vill. of Oak Lawn, Ill.*, 735 F.3d 967, 971-72 (7th Cir. 2013); *United States v. Howard,* 729 F.3d 655, 659-61 (7th Cir. 2013). Directing a person to keep his hands out of his pockets falls comfortably into that category of commands.

As for restrictions on Meier's movement, the estate's evidence is not compelling. The estate says in its brief that Meier was trapped because defendants' vehicles were blocking the

road. But plaintiffs' proposed findings of fact do not address that issue, so it is forfeited. *See* "Motions for Summary Judgment," at 2, *attached to* Dkt. 22 ("[T]he material facts must be proposed in a statement of proposed facts."). In its brief, the estate cites an unauthenticated exhibit identified only as a photo of "Officer Stumo's squad SUV." Dkt. 59-12. Even assuming that the photo represents how the officers' vehicles were parked during the relevant time, the photo shows that the SUV is parked on one side of the road with ample room left to pass.

The length of time that the officers pursued Meier and the closeness with which they followed him is one factor that could contribute to a sense Meier was not free to terminate his encounter with the officers. But the estate does not cite an analogous case holding that following an individual for an extended time—alone or with the other cited facts—qualifies as a seizure. Nor does the estate point to a more general Fourth Amendment principle that defendants obviously violated.

The estate cites two cases, but one of them is not binding on this court and neither one clearly establishes that the officers seized Meier under the Fourth Amendment. In *United States v. Jerez*, the court concluded that officers had seized a hotel room occupant after the officers had knocked on the door for three minutes in the middle of the night, identified themselves as the police, told the occupant to open the door so they could talk to him, knocked on the window when he did not answer the door, shined a flashlight in the window, and continued knocking on the door while another officer stood at the window. 108 F.3d 684, 687 (7th Cir. 1997). In *United States v. Wilson*, the court concluded that officers seized the defendant when they approached him at the airport, asked to search his coat, then continued walking with him and asking to search his coat after the defendant repeatedly refused to consent and told the officers to stop harassing him, asked him to consent to a screening by a drug-sniffing dog, asked

him to come down to the police station, followed him out of the terminal and again asked to search his coat repeatedly despite the defendant loudly accusing the officers of harassing him, and repeatedly asked the defendant why the officers could not search his coat. 953 F.2d 116, 118–19 (4th Cir. 1991).

The estate contends that Eaton and Stumo's persistence in following Meier is like the conduct the courts in *Jerez* and *Wilson* found to be a seizure. But that isn't persuasive, at least for the purpose of defeating a qualified immunity defense. Both *Jerez* and *Wilson* involved much more than officers following a suspect for an extended period of time. In both cases, the officers used harassing and coercive means to obtain consent to conduct searches. In this case, the estate points to no specific behavior that Eaton and Stumo were attempting to elicit. In *Jerez*, the court emphasized that the hotel-room occupant was trapped in the room late at night and could not disregard officers while they continued knocking. 108 F.3d at 691–92. In *Wilson,* the officers' conduct was extreme and harassing, and it continued even after the suspect repeatedly told the officers to stop. Defendants' conduct simply did not rise to the level of the officers in those cases. Under these circumstances, Eaton and Stumo are entitled to qualified immunity on the question whether they seized Meier.

### 2. Whether a seizure was justified under the community caretaker doctrine

Even if their conduct qualifies as a Fourth Amendment seizure, defendants contend that their conduct was justified under the "community caretaker" doctrine because they were acting to protect Meier and others who might encounter him, not to search him or otherwise enforce criminal laws against him. The community caretaker doctrine is an exception to the general rule that an officer's search or seizure must be justified by a warrant, probable cause, or reasonable suspicion. The Supreme Court has applied the doctrine only to searches of cars that

13

are conducted for a non-criminal purpose, usually public safety. *See Cady v. Dombrowski*, 413 U.S. 433 (1973). The Court of Appeals for the Seventh Circuit has declined to extend the doctrine to searches of homes or businesses. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553–54 (7th Cir. 2014). The court of appeals has not expressly considered whether the doctrine applies to searches of persons in public places, but the court has stated that it "has limited the community caretaker doctrine to automobile searches." *Id.* at 555.

This court need not decide whether the court of appeals would apply the doctrine to searches of persons in public places because the court of appeals has held that courts evaluating a qualified immunity defense must also consider case law from the Wisconsin state courts, which have applied the community caretaker doctrine more broadly. *Id.* at 573. Specifically, under Wisconsin's application of the doctrine, an officer doesn't need a warrant, probable cause, or reasonable suspicion for any search or seizure if he meets two requirements: (1) the officer was exercising a bona fide community caretaker function; and (2) the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised. *State v. Pinkard*, 2010 WI 81, ¶ 29, 327 Wis. 2d 346, 785 N.W.2d 592.

Under the first requirement, the question is whether the officer "has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function." *Id.*, ¶ 31. The officer may meet this requirement even if he also has law enforcement concerns. *Id.* The second requirement is informed by four factors: (1) the importance of the public interest and the exigency of the situation; (2) surrounding circumstances such as the time, location, the degree of overt authority and force displayed;

(3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives. *Id.*, ¶ 42.

In *Sutterfield,* the court concluded that officers were entitled to qualified immunity under *Pinkard* when they conducted the following searches and seizures:

- Entering the individual's home: the individual had expressed suicidal thoughts to her physician earlier that day, and officers entered her home to assure her well-being. *Sutterfield,* 751 F.3d at 576.

- Opening and searching a locked case discovered in the home: officers reasonably believed that the case could contain a weapon that the individual could use to harm herself, and the intrusion on her privacy was justified by the public interest in protecting the safety and well-being of both the individual and others in the home. *Id.* at 577–78.

- Seizing the gun: officers reasonably believed that the individual could use the firearm to harm herself. *Id.* at 578.

Eaton and Stumo are entitled to qualified immunity under *Pinkard* and *Sutterfield*. When the officers encountered Meier, they had a report that he had shown up naked on a stranger's farm in cold temperatures. He initially had clothes on when they met him, but his car had been driven into a snowbank, he was wandering around without apparent purpose, he was making bizarre comments, and he was otherwise acting very strangely. Under these circumstances, it was reasonable for the officers to follow him, for Meier's own protection and the protection of others who might encounter him. Even the officers' decision to take out their tasers was based on Meier's expressed intent to enter the freezing water. The estate points to no conduct by Eaton or Stumo suggesting that they followed Meier to find evidence of criminal conduct. As the estate points out in a different section of their brief, the officers asked Meier no questions about whether he had in fact been naked before they arrived or had committed any other crime, Dkt. 57, at 26, and they did not attempt to search him.

The estate says that the officers' intrusion wasn't justified because alternatives were available to following Meier so closely. Specifically, the estate says that the officers did not follow Wisconsin Chapter 51 procedures for dealing with mental illness, they did not attempt to determine whether Meier had been flagged as a person with mental disabilities, and they did not try to call the registered owner of the car or Meier's family. The estate doesn't explain what Chapter 51 procedures defendants failed to follow, so they forfeited that issue. They also don't cite any evidence that Meier *had* been flagged as a person with a mental illness, so there is no basis for inferring that any failure to check on this caused any harm.

The estate also doesn't explain how any of their proposed actions are alternatives to following Meier to make sure that he did not harm himself or others. Even if the officers had attempted to contact Meier's family, they still would have needed to take some action while they waited for family members to arrive. The estate doesn't dispute that it was reasonable for the officers to follow Meier because of his very strange behavior, but the estate says that the officers should have "watch[ed] him at a distance." Dkt. 57, at 43. The estate doesn't explain what distance would have been appropriate. But even if the estate is correct that the officers agitated Meier by following him too closely, Eaton and Stumo could have reasonably believed that they needed to stay close to Meier to prevent him from harming himself or others. Eaton also says that he wanted to stay close to Meier, so Eaton didn't need to yell to communicate with Meier. The estate doesn't explain why that was an unreasonable concern.

Eaton and Stumo are entitled to qualified immunity on this claim based on the community caretaker doctrine.

### 3. Probable cause

Even assuming that the officers' conduct amounted to an arrest that must be justified by probable cause, Eaton and Stumo are entitled to qualified immunity on that ground as well. In the context of a qualified immunity defense, the question is whether a reasonable officer could have mistakenly believed that probable cause existed, or, in other words, whether the officer had "arguable" probable cause that the suspect had committed a crime. *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). Probable cause exists if the information known to the officer would support a reasonable belief that the suspect had committed a crime. *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010). This is an objective test, so it doesn't matter whether the officers were investigating a particular crime or believed that the suspect committed the crime. *See U.S. v. Garcia-Garcia*, 633 F.3d 608, 612–13 (7th Cir. 2011) The question is simply whether the officers possessed facts that would support a finding of arguable probable cause. *See id.*

In this case, defendants say that they had probable cause to arrest to Meier for three offenses: public nudity (Wis. Stat. § 944.20(b)), disorderly conduct (Wis. Stat. 947.01), and operating a vehicle under the influence of an intoxicant or drug (Wis. Stat. § 346.63). The court need not discuss all of three of these. It is enough to say that defendants had arguable probable cause that Meier had driven his car while intoxicated. The same facts that support the application of the community caretaker doctrine also support a finding that Meier had been driving while intoxicated: Meier's car had been driven into a snowbank, a witness had reported that he was naked in public and acting strangely, and the officers themselves witnessed bizarre behavior that was consistent with Meier being under the influence of drugs. That's enough for a reasonable belief that Meier had violated § 346.63, or at least it's enough for a

finding of arguable probable cause. The estate does not cite authority showing that more evidence was required to establish probable cause. In fact, the estate did not respond to this argument at all. So Eaton and Stumo are entitled to qualified immunity on the detention claim because they had arguable probable cause that Meier had operated his car under the influence of drugs.

## B.  Use of force

The estate contends that both Eaton and Stumo used excessive force against Meier, Eaton by deploying his taser and Stumo by shooting Meier. The court will grant summary judgment to both defendants on these claims.

### 1.  Eaton's deployment of the taser

Eaton initially challenges this claim on the ground that the estate didn't include the claim in their complaint. It is true that the complaint doesn't include a separate "count" for excessive force by Eaton. That count names Stumo only. Dkt. 1, at 12. The reason for the omission isn't clear, but that doesn't matter for the purpose of stating a claim. The estate satisfies federal pleading standards so long as they give the defendant fair notice of the factual basis of their claims. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014). The plaintiff doesn't have to identify legal theories. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). So a failure to match up a defendant with a particular legal theory in the complaint doesn't bar the plaintiff from asserting that legal theory later, so long as the complaint provides the factual basis for that theory. *See Stahenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 805 (W.D. Wis. 2021) (allowing plaintiff to proceed on negligence theory that wasn't identified in the complaint because the complaint included allegations that provided the factual basis for that claim).

18

The complaint includes allegations that Eaton used force on Meier by deploying his taser, *see* Dkt. 1, ¶ 49, so defendants had notice of the claim. There is no prejudice to defendants because both sides briefed the merits of the claim. So the court will proceed to the merits.

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). This determination is made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). The county defendants (which include Eaton) do not discuss qualified immunity regarding this claim in their briefs, so the court will consider only whether a reasonable jury could find that Eaton violated the Fourth Amendment, not whether the violation was clearly established.

Both Eaton and Stumo testified that Meier charged Stumo just before Eaton deployed his taser. Dkt. 52 (Eaton Dep. 77:12–20); Dkt. 51 (Stumo Dep. 97:19–98:1, 107:4–21). The estate does not appear to dispute that Eaton was entitled to deploy his taser if in fact Meier was charging at Stumo at the time.[2] The court of appeals has held that the use of taser is

---

[2] In their response to defendants proposed findings of fact, the estate points out that Eaton described Meier's conduct as "rushing" rather than "charging" in a statement to the Wisconsin Department of Justice. Dkt. 79, ¶ 34.  But the estate doesn't identify a meaningful difference between the two words for the purpose of determining whether Eaton used excessive force, and the court does not discern a meaningful difference.

justified under the Fourth Amendment when a suspect is actively resisting, kicking and flailing, declining to follow instructions while acting in a belligerent manner, or swatting an arresting officer's hands away while backpedaling. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (collecting cases). In the cases that the court of appeals has held that the use of a taser was *not* justified, the suspect was not resisting or was only passively resisting. *Id.* Charging an officer cannot be fairly described as passive resistance.

The estate's claim rests on its contention that a reasonable jury could find that Meier was not actually charging Stumo. Instead, Meier may have wanted simply to run *past* Stumo. The estate contends that there is a genuine issue of material fact because Stumo was 40–50 feet from Meier when Meier started running, and Eaton was 40–50 feet from *Stumo*, so Stumo was too far away from Meier, and Eaton was too far away from Stumo to determine whether Meier was actually charging Stumo. The estate essentially is arguing that regardless of whether you are the person potentially being charged or a witness near the person doing the alleged charging, you cannot reliably determine whether someone is "charging" at another person who is 40–50 feet away.

If the question were whether Meier actually did intend to charge Stumo, the court might agree with the estate that there are multiple reasonable inferences a jury could draw. But that's not the question. Rather, it is whether Eaton could have reasonably perceived that is what Meier was doing. Eaton is entitled to summary judgment on that issue.

Here's what Eaton knew when he deployed his taser:

- Meier suddenly began running toward Stumo after Eaton and Stumo directed Meier to keep his clothes on and drew their tasers.

- Both Meier and Stumo were on a road with snowbanks on either side, limiting the directions where Stumo could be running.

- Meier's behavior had been bizarre and erratic since Eaton and Stumo first encountered him, including statements about the officers shooting him.

- Dispatch informed Eaton that Meier had a violent history, including a fight that resulted in a death.

Based on that information, it was reasonable for Eaton to determine that Meier's sudden decision to run toward Stumo was an aggressive act that risked Stumo's safety. The estate's position seems to be that that Eaton should have waited to deploy his taser until he could be sure whether Meier was running *at* Stumo or simply past him. But by then, it could have been too late for Eaton to do anything about it. It was reasonable for Eaton to act when he did.

The court will grant summary judgment to Eaton on the estate's excessive force claim against him.

### 2. Stumo's use of deadly force

The estate also asserts a claim based on Stumo's use of force against Meier: Stumo shot Meier in the chest, killing him. When an officer uses deadly force, the question under the Fourth Amendment is whether the officer reasonably believed that he was in imminent danger or the person was actively resisting arrest and the circumstances warrant that degree of force. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 484-85 (7th Cir. 2015).

Stumo says that deadly force was justified or at least that he is entitled to qualified immunity, relying primarily on two cases, *Siler v. City of Kenosha*, 957 F.3d 751 (7th Cir. 2020), and *Guerra v. Bellino*, 703 Fed.Appx. 312 (5th Cir. 2017). In *Siler*, the officer responded to a request for assistance apprehending a man suspected of strangulation and suffocation. The officer chased the suspect in his car until the suspect crashed into a tree and fled on foot. The officer got out of his vehicle and pursued the suspect, who ignored commands to stop. The

officer followed the suspect into an auto body repair shop, where the suspect refused commands to come out from a back room. He eventually came out, and the officer began chasing the suspect around an SUV. The officer drew his gun and ordered the suspect to the ground, but the suspect refused, stating, "shoot me." The officer saw that the suspect had "a black cylindrical object pressed against [his] forearm." The suspect refused orders to drop the object, and the officer could not see the suspect's hands. When the suspect moved toward the officer, the officer shot the suspect, killing him. *Siler*, 957 F.3d at 754–57. The court concluded that the officer was entitled to qualified immunity because the suspect was suspected of committing violent acts, had refused commands, was holding something in his hand that could have been a weapon, and "chose to become the aggressor" by moving toward the officer. *Id.* at 760.

In *Guerra*, an officer responded to a report that a shirtless man was walking and stumbling through traffic. When the officer made contact with the man, he was swinging his arms back and forth and refused an order to stop walking. The officer drew his gun and threatened to shoot when the man continued advancing. The man complied with an order to place his hands on the hood of the officer's car. The man then moved rapidly toward the officer, who then fired three shots at the man, killing him. *Guerra*, 703 Fed. Appx. at 314–15. The court concluded that the officer was entitled to qualified immunity because he could have reasonably believed that the man posed a threat of serious harm. *Id.* at 317.

*Siler* and this case are similar in important respects. In both cases, the officers believed that the suspect had a violent history, the suspect was refusing commands, he referred to the officers shooting him, and he was advancing on the officers when the officers shot him. There is at least one significant difference between this case and *Siler*, which is that the officer in *Siler* believed that the suspect might be holding a weapon of some kind. But that did not appear to

22

be a dispositive fact. The court of appeals emphasized that the suspect had demonstrated "an aggressive state of mind" and had "dared the Officer to shoot him," so deadly force was justified based on the "real" possibility that the suspect could try to disarm the officer. *Id.* at 760. In this case, Meier did not "dare" the officers to shoot him, but he did say, "You may as well shoot me," which Stumo reasonably could have interpreted as threatening.

*Guerra* is even more on point, as it involved a suspect who was behaving bizarrely, refused some (but not all commands), and then moved rapidly toward the officer. It is not a Seventh Circuit case, but other circuit precedent can be relevant to a qualified immunity analysis when neither Supreme Court or circuit precedent are dispositive. *See Graham v. Hildebrand*, 203 Fed. Appx. 726, 731 (7th Cir. 2006).

The estate does not cite any cases to support a conclusion that Stumo violated clearly established law. Instead, the estate relies on the observation in *Cyrus v. Town of Mukwonago* "that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," particularly when "the one against whom force was used has died," so he cannot testify. 624 F.3d 856, 862 (7th Cir. 2010). The estate says that summary judgment is inappropriate under *Cyrus* because there is no video evidence, and the dispatch audio recording "appears to be missing at least eighteen minutes." Dkt. 58, at 28. This contention is based on the fact that that the audio record runs approximately 30 minutes, but the audio was recorded over a period of approximately 48 minutes.

*Cyrus* does not help the estate here. That case did not set down a rule that summary judgment is never appropriate in excessive force cases, only that disputed facts often preclude summary judgment. As the court of appeals has since clarified, the plaintiffs retain the burden

to identify a genuine issue of material fact in an excessive force case, even when the suspect has died. *Estate of Escobedo v. Martin*, 702 F.3d 388, 409 (7th Cir. 2012). The estate failed to meet its burden here.

The estate's reliance on the "missing" audio recording is unhelpful for three reasons. First, a party is not entitled to an adverse inference for missing evidence unless the party shows that the opposing side intentionally destroyed it for the purpose of hiding it. *Downing v. Abbott Lab'ys*, 48 F.4th 793 (7th Cir. 2022). The estate does not acknowledge that standard, let alone cite evidence in support of it. Second, the estate doesn't identify what inference, reasonable or otherwise, the court should draw from what it says is the missing portion of the recording. The estate cites no authority for the view that the court must deny summary judgment in any case involving missing evidence. Third, and most important, the estate has not shown that any evidence is missing. Defendants cite the testimony of an employee of the Eau Claire Emergency Communications Center, which was responsible for the audio recording. Dkt. 68. The employee states that the center records audio only when an officer or dispatch is speaking; "the dispatch audio recording does not include the dead airtime between the actual transmissions." *Id.*, ¶ 5. The estate cites no contrary evidence.

The estate has not shown that Stumo's use of deadly force violated clearly established law, even drawing all reasonable inferences in plaintiffs' favor. The court will grant summary judgment to Stumo on this claim.

## C.  Municipal liability

The estate contends that both Eau Claire County, the Eau Claire County sheriff, the City of Augusta, and the Augusta police chief had unconstitutional policies.[3] Specifically, the estate says that neither the county nor the city had adequate policies or training for dealing with suspects with mental illness.

A constitutional claim against a municipal defendant such as a county or city requires the plaintiff to prove four things: (1) a constitutional deprivation; (2) action or inaction by the municipal defendant or its employees that can be fairly described as the municipality's policy; (3) notice to the defendant that its policy would lead to constitutional violations; and (4) a direct causal connection between the defendant's policy and the constitutional injury. *See Thomas v. Neenah Joint School District*, 74 F.4th 521, 524 (7th Cir. 2023); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022); *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021); *Lapre v. City of Chicago*, 911 F.3d 424, 430–31 (7th Cir. 2018). The estate doesn't address *any* of these elements in their briefs, so they have forfeited their claims for municipal liability. The estate doesn't explain what specifically was wrong with the county and city's policies and training, what policies and training programs the county and city should have adopted, what gave notice to the county and city that gaps in their policies or training would lead to constitutional violations, or how different policies would have prevented the harm to Meier.

---

[3] The estate does not allege that the sheriff or police chief were personally involved in the events of this case, only that they may be held liable as representatives of the county and city. The court concludes that the estate's municipal liability claims fail on the merits, so the court need not consider defendants' contention that the sheriff and police chief should be dismissed as redundant.

25

It's not enough for a plaintiff to point out that a municipality's policies didn't address certain issues. The plaintiff must show that any gaps in policies violate the Constitution under the standard for municipal liability. The estate failed to do that, so defendants are entitled to summary judgment on the estate's municipal liability claims.

## D.  Disability claims

The estate contends that both the county and the city violated Title II of the Americans with Disabilities Act and the Rehabilitation Act by discriminating against Meier because of a mental disability. Specifically, the estate says that Meier suffered from a mood disorder, depression, a personality disorder, and anxiety; Eaton and Stumo knew that he had a mental disability; and Eaton and Stumo failed to reasonably accommodate that disability by checking whether he had been flagged as a person with mental disabilities, by failing to follow Eau Claire County Sheriff's Department Policy 3.7, and by failing to ask mental health crisis workers to respond to the scene.

The court of appeals has set forth three elements for a Title II claim: (1) the plaintiff is disabled; (2) the defendants denied him access to a program, service, or activity because of his disability; and (3) he is otherwise qualified for the program, service, or activity. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). A refusal to provide a reasonable accommodation qualifies as a denial of access. *Shaw v. Kemper*, 52 F.4th 331, 334–35 (7th Cir. 2022). But to recover damages, the plaintiff must also prove that the disability discrimination was intentional, which includes "deliberate indifference," or a failure to act despite knowing "that harm to a federally protected right was substantially likely." *Lacy v. Cook County*, 897 F.3d 847, 862 (7th Cir. 2018). A claim under the Rehabilitation Act has the same elements, with the additional element that the defendant receives federal funding. *Wagoner*, 778 F.3d at 592.

It is not immediately apparent how the elements of a Title II or Rehabilitation Act claim apply in the context of a police investigation. The Court of Appeals for the Seventh Circuit has considered the issue twice, and both times declined to decide whether the statutes apply in that context. *Martin v. Noble Cnty. Sheriff's Department*, No. 21-1214, 2021 WL 5505407, at *2 (7th Cir. Nov. 24, 2021); *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 988 (7th Cir. 2020).

The court will assume both that federal disability statutes can apply to a police seizure and that Meier suffered from one or more mental disabilities. But these assumptions don't help the estate because it hasn't adduced evidence that defendants treated Meier less favorably because they believed he had a mental disability or that defendants knew of a substantial likelihood that their failure to provide the accommodations the estate identifies would harm Meier. Eaton and Stumo did provide what could be described as accommodations based on Meier's symptoms. They chose not to activate their squad car lights so as not to alarm him, they approached him on foot, they used a calm tone of voice, they identified themselves by their first names to establish rapport, they offered to let Meier warm up in their car, they told him they were there to help him multiple times, and they called for backup rather than trying to detain Meier. An individual with a disability is not entitled to the accommodation of his choice, only a reasonable accommodation. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682–83 (7th Cir. 2014). The estate doesn't cite any evidence suggesting that the accommodations defendants provided were unreasonable or that they knew that their efforts would be inadequate, as is necessary to recover damages.

The estate also hasn't adduced evidence that the accommodations the estate identifies would have a made a difference to the outcome. As for defendants' failure to check whether

Meier had been flagged as a person with a mental illness, the estate hasn't adduced evidence that Meier was on any list or in any database that would flag him as mentally ill. So the estate can't show that Meier was harmed by defendants' failure to check. As for defendants' failure to implement county policy 3.7, the estate doesn't explain what the policy is or how implementing it would have made a difference. As for defendants' failure to summon crisis workers, the parties dispute how long it would have taken for the crisis workers to arrive had defendants summoned them. But the dispute is immaterial because the estate admits that the crisis workers would not have responded until the scene was secured, and the officers were never able to secure the scene. Dkt. 79, ¶ 50. So contacting the crisis workers wouldn't have changed anything either.

The bottom line is that no reasonable jury could find that defendants violated Meier's rights under the ADA or the Rehabilitation Act. The court will grant summary judgment to defendants on these claims.

ORDER

IT IS ORDERED that defendants' motions for summary judgment, Dkt. 34 and Dkt. 43, are GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered November 28, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge